UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
ECHOSTAR DBS CORPORATION, ECHOSTAR
ACQUISITION L.L.C., and ECHOSTAR
SATELLITE L.L.C.,

               Plaintiffs,

   - against -                              05 Civ. 8510 (DAB)
                                         <u>MEMORANDUM & ORDER</u>

GEMSTAR-TV GUIDE INTERNATIONAL, INC.,
and SUPERSTAR/NETLINK GROUP L.L.C.

              Defendants.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     The Defendants in this action – Gemstar-TV Guide

International, Inc. ("Gemstar") and Superstar/Netlink Group

L.L.C. ("SNG") – have moved this Court pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure to dismiss Plaintiffs'

Complaint.  The Plaintiffs – Echostar DBS Corporation ("DBS"),

Echostar Acquisition L.L.C. ("Acquisition"), and Echostar

Satellite L.L.C. ("Satellite") – oppose Defendants' Motion.  For

the reasons contained herein, Defendants' Motion is GRANTED.


## I. BACKGROUND

     The following facts, which are alleged in the Complaint, are

assumed to be true for purposes of this Motion.

     Plaintiffs allege that Defendants breached warranties,

representations, and covenants either contained in, or implied

1

by, the parties' Asset Purchase Agreement ("APA").  (Compl. ¶ 1.)
All three Plaintiffs – DBS, Acquisition, and Satellite – are
Colorado limited liability companies with their principal places
of business at the same address in Englewood, Colorado.  (Compl.
¶¶ 10-12.)  Defendant Gemstar is a Delaware corporation with its
principal place of business in California.  (Compl. ¶ 13.)
Defendant SNG is a Delaware corporation with its principal place
of business in Oklahoma.  (Compl. ¶ 14.)  Gemstar was at all
times relevant the majority shareholder of SNG, holding
approximately 80% of SNG's stock.  (Compl. ¶ 22.)  Gemstar later
purchased the outstanding minority interest of SNG, making SNG
Gemstar's wholly owned subsidiary.  (Compl. ¶ 23.)

     Plaintiffs use high-powered satellites to broadcast
television program packages to viewers who have purchased the
requisite equipment.  (Compl. ¶ 19.)  Defendant Gemstar develops,
licenses, markets and distributes products and services that
facilitate a television viewer's ability to canvass television
stations, among other things.  (Compl. ¶ 21.)  Defendant SNG
markets and authorizes access to entertainment programming for C-
Band home satellite dish owners.

     On November 2, 1999, Satellite and SNG entered into a C-Band
Conversion Agreement ("C-Band Agreement").  (Compl. ¶ 24.)  Under
that agreement, SNG was appointed "as a non-exclusive authorized

representative to promote and solicit orders for EchoStar
programming from individuals who were existing C-Band
subscribers". (Compl. ¶ 25.)  Satellite paid $250 to SNG for each
order that resulted in the activation of a Converted Subscriber[1],
and $100 for each order from an Eligible C-Band Subscriber[2] that
was submitted by a third party rather than by SNG.  (Compl. ¶
27.)  The C-Band Agreement required SNG to furnish Satellite with
a Subscriber List of all Eligible C-Band Subscribers.  (Compl. ¶
57.)  SNG agreed either to update this list on a monthly basis,
or to use "any other method pursuant to which SNG [could]
reasonably demonstrate that a subscriber placing an Order is an
Eligible C-Band Subscriber".  (Compl. ¶ 57; Pls.' Mem. in Opp. at
16.)  According to Plaintiffs, SNG furnished Satellite with a
subscriber list at the end of 1999, but did not fulfill its
obligation to furnish Satellite with monthly updates.  As a
result, Satellite paid SNG commissions for people who were not
properly qualified as Eligible C-Band Subscribers
("overpayment").  (Compl. ¶ 57.)

---

[1] See ¶ 3.2 of the C-Band Agreement, which has been attached to
the Declaration of Paul D. Sarkozi as Exhibit B, for an
explanation of the term "Converted Subscriber".  At the Court's
permission, Defendants filed Exhibit B under seal.

[2] See ¶ 2.1 of the C-Band Agreement at Sarkozi Dec., Ex. B, for
an explanation of the term "Eligible C-Band Subscriber".

These alleged overpayments amount to $5-6 million. Plaintiffs assert that Satellite neither knew, nor had reason to know, that a substantial amount of the commission paid to Defendants was never due and owing to SNG.  (Compl. ¶ 28.)  SNG allegedly controlled the records used to determine who was an active C-Band subscriber.  (Pls.' Mem. in Opp. at 16 n. 11.) Plaintiff paid the $5-6 million because, under the C-Band Agreement, Satellite promised that it would "not unreasonably and intentionally reject an Order for the purpose of avoiding payment of Commissions . . . ."  (Pls. Mem. in Opp. at 16, n.11.)

On March 1, 2004, Plaintiffs DBS and Acquisition entered into an Asset Purchase Agreement ("APA") with Gemstar and SNG. (Compl. ¶ 32.)  Under the terms of that Agreement, the C-Band Agreement was terminated.  (Compl. ¶ 32.)  The APA further provided for the sale of certain assets by Defendants to Acquisition and DBS.  (Compl. ¶ 34.)  Among the assets acquired by Plaintiffs were assets of SNG.  (Compl. ¶ 4.)

Plaintiffs allege that Defendants buried the $5-6 million overpayment within their financial records so as to render it impossible for Plaintiffs to learn about it.  (Compl. ¶¶ 36-41.) To this end, Defendants allegedly created different financial statements than those generated in the normal course of business. (Compl. ¶ 39.)  The Balance Sheet supplied to Plaintiffs during

4

the APA negotiations listed the accounts payable and "accrued liabilities" as a single line item in the amount of $19,481,759. According to Plaintiffs, Gemstar and SNG intentionally failed to itemize this amount because they wanted to cover up the $5-6 million overpayment.  (Compl. ¶ 41.)  Plaintiffs further allege that Defendants knew that DBS and Acquisition were not aware of the overpayment.  (Compl. ¶ 37.)

According to the Complaint, Defendants did not permit DBS and Acquisition to inquire into or examine SNG's accounts payable and accrued liabilities because those liabilities were not being purchased.  (Compl. ¶ 42.)  Plaintiffs aver that Defendants "refused to tell [them] about the payable due to them during the negotiations of the APA or at any other time."  (Compl. ¶ 45.) Defendants allegedly represented to Plaintiffs that the Balance Sheet was "legitimate" and that it did not contain any material representations or omissions.  (Compl. ¶ 45.)

Plaintiffs are not bringing suit for a breach under the C-Band Agreement.  Rather, they contend that Defendants' conduct constitutes breaches under several provisions of the APA.  Under Section 5.09 of the APA, Defendants represented and warranted that:

> [T]o the knowledge of Sellers there is no existing
> condition, situation or set of circumstances that
> would reasonably be expected to result in such a
> Proceeding or Restrictive Order being brought

5

> against or in respect of any of the Acquired
> Assets or Seller Businesses . . . .

(Compl. ¶ 44.)  Under Section 5.10(a) of the APA, Defendants

warranted that they:

> delivered to [DBS and Acquisition] complete and
> accurate copies of (i) the Reference Balance
> Sheets . . . [which were] prepared from, and are
> in accordance with, the books and records of the
> Sellers, and fairly present, in all material
> respects, the financial position of the applicable
> Seller Business as of the Reference Date . . . .

(Compl. ¶ 47.)  Plaintiffs allege that Defendants breached both

of these APA sections.

        Plaintiffs also cite Section 5.22 as a breached provision.

In that section, Defendants represented that "[t]he copies of

documents delivered, provided or made available by the members of

the Seller Group to [DBS and Acquisition] pursuant to the terms

of this Agreement are complete and accurate in all material

respects."  (Compl. ¶ 54.)

        Section 2.06(a) of the APA obliged Defendants to "cure, or

cause any of its Affiliates to cure, all material defaults or

breaches (or events that would become such with a lapse of time

or the giving of notice or both) to any Seller or any subsidiary

of Seller under the terms of any Assigned Contract [C-Band

Agreement] . . . ."  (Compl. ¶ 56.)  Plaintiffs allege that

Defendants violated this provision by not curing alleged breaches

of the C-Band Agreement.  (Compl. ¶ 57.)

Plaintiffs not only allege breaches of the APA that pertain to the overpayment, but they also allege that Defendants breached the APA by not providing certain transition services.  Section 7.10(a) of the APA provides:

> Prior to the Programming Distribution Closing, the parties shall execute and deliver a transition services agreement (the "Transition Services Agreement") . . . which identifies the services that Gemstar and its Subsidiaries shall make available to [DBS and Acquisition] after the applicable Closing to ensure the continued operation of each of the Seller Businesses and to avoid any material interruption or disruption thereof (collectively, the "Transition Services").

(Compl. ¶ 59.)  Defendants allegedly did not fulfill their obligation to provide certain Transition Services, including keeping backup tapes and software on behalf of DBS and Acquisition.[3]  (Compl. ¶¶ 61-62.)

Plaintiffs further allege that Defendants breached the implied covenant of good faith and fair dealing.  (Compl. ¶ 66(G).)  As an alternative to that claim and their other breach of contract theories, Plaintiffs seek recovery for unjust enrichment.  Lastly, Plaintiffs seek indemnification under Section 12.02(a) of the APA whereby Defendants agreed to:

> indemnify [DBS and Acquisition] . . . against, and agree[d] to hold each of them harmless from, any

---

[3] Plaintiffs concede that their claim for breach of Section 5.05 of the APA is unfounded.  Therefore, the Court need not consider this provision for purposes of deciding the present Motion.

7

> and all Losses, whether involving Third-Party
> claims or a claim solely between the parties
> hereto, incurred or suffered by [DBS or
> Acquisition] arising out or in connection with (i)
> any misrepresentation or breach of any covenant or
> agreement made by [Defendants] . . . (ii) any
> breach of covenant or agreement made or to be
> performed by [Defendants] pursuant to [the]
> Agreement . . . or (iv) any Excluded Liability.

(Compl. ¶ 78.)

## II. DISCUSSION

### A.    Legal Standard on a Motion to Dismiss

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff."  Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted).  "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).  A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Bernheim v. Litt, 79 F.3d 318,

8

321 (2d Cir. 1996).  Dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  Cooper v. Park, 140 F.3d 433, 440 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

    For purposes of a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted).  However, if the allegations of a complaint are contradicted by documents incorporated in the complaint, the documents control and the court need not accept the allegations of the complaint as true.  See Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) (citing Feik v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981); see also Matusovsky v. Merrill Lynch, 186 F. Supp. 397, 400 (S.D.N.Y. 2002) ("allegations . . . contradicted by . . . a document [referenced in the complaint] are insufficient to defeat a motion to dismiss"); Rapoport v. Asia Elecs. Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (granting motion to dismiss where "documents [referenced but not attached to complaint] contradict Plaintiff's allegations.").

B.   <u>Breach of Contract Claims</u>

     "Contract remedies exist to give injured parties the
benefit of their bargain."  <u>Capital Nat. Bank of New York v.
McDonald's Corp.</u>, 625 F. Supp. 874, 883 (S.D.N.Y. 1986) (citing
<u>County of Suffolk v. Long Island Lighting Co.</u>, 728 F.2d 52, 63
(2d Cir. 1984); <u>International Customs Associates, Inc. v. Ford
Motor Co.</u>, 893 F. Supp. 1251, 1255-56 (S.D.N.Y. 1995); <u>Clalit
Health Services v. Israel Humanitarian Foundation</u>, No. 02 Civ.
6552, 2003 WL 22251329, at *3 (S.D.N.Y. Sep. 30, 2003).  Only
parties to a contract have standing to assert a claim for breach
of contract.  <u>See</u> <u>Clalit</u>, 2003 WL 22251329, at *3.  Without a
contractual relationship, there cannot be a contractual remedy.
<u>Capital Nat. Bank of New York</u>, 625 F. Supp. at 883.

     Under New York law, a claim for breach of contract must
allege:  (1) the existence of a contract; (2) that the plaintiff
has performed his or her obligations under the contract; (3)
that the defendant failed to perform his or her obligations
thereunder; and (4) resulting damages to the plaintiff.  <u>See</u>
<u>W.B. David & Co., Inc. v. DWA Communications, Inc.</u>, No. 02 Civ.
8479, 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004); <u>Global
Intellicom, Inc. v. Thomson Kernaghan & Co.</u>, No. 99 Civ. 342,
1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999).  "In pleading
these elements, a plaintiff must identify what provisions of the

10

contract were breached as a result of the acts at issue." <u>Wolff v. Rare Medium, Inc.</u>, 171 F. Supp. 2d 354, 358 (citing <u>Levy v. Bessemer Trust Co., N.A.</u>, No. 97 Civ. 1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).

Satellite signed the C-Band Agreement, but did not sign the APA.  Because only parties to an agreement may assert a claim for a breach thereunder, <u>Clalit</u>, 2003 WL 22251329, at *3, and because Plaintiffs do not allege that Satellite was a third-party beneficiary of the APA, Satellite does not have standing to bring suit under the APA.  EchoStar Satellite's breach of contract claim against Defendants is hereby DISMISSED for lack of standing.

DBS and Acquisition, however, have standing to bring a claim for breach of the APA because they signed it.  Moreover, Plaintiffs DBS and Acquisition have satisfied the first, second, and fourth elements for breach of express warranty as to all of the APA provisions they allege were violated.  The parties do not dispute the existence of the APA (first element); Plaintiffs allege that they performed their APA obligations (second element) (Compl. ¶ 66); and they allege resulting damages of at least $5-6 million (fourth element) (Compl. ¶ 68).  But Plaintiffs do not satisfy the third breach of contract element on any of the express provisions they cite.

11

Plaintiffs allege that Defendants did not satisfy the covenant presented in Section 5.09 of the APA.  That section provides that Defendants did not have any knowledge of any condition that could reasonably be expected to result in a Proceeding in respect of any of the Acquired Assets or Seller Businesses.  (Compl. ¶ 44.)  Plaintiffs' claim for breach of APA 5.09 fails because they cite no specific Proceeding that Defendants could reasonably have expected Plaintiffs to bring. Where they address Section 5.09 in their Complaint, Plaintiffs merely recapitulate their other allegations and then generally assert that "[s]uch conduct would reasonably be expected to result in a Proceeding brought against [Defendants]."  (Compl. ¶ 45.)  Plaintiffs make no mention of a specific legal claim or other type of Proceeding, and cannot rely on the other claims in the Complaint to satisfy this requirement, because, as discussed supra, none of them are viable causes of action.  Moreover, any suggestion that a claim by Plaintiffs for a default under the C-Band Agreement should have been anticipated also is in error. Bringing a claim under one contract for a breach of another contract is bootstrapping, and therefore is not proper.

Plaintiffs also fail to allege that Defendants did not perform their duties under Section 5.10.  That provision requires Defendants to have delivered to Plaintiffs "complete

12

and accurate" copies of Reference Balance Sheets that "fairly present . . . the financial position" of Defendants.  (Compl. ¶ 47.)  Plaintiffs admit that the Balance Sheet Defendants provided included the total amount of Defendants' liabilities. Plaintiffs contend that Defendants' failure to itemize the total amount rendered the Balance Sheet incomplete and inaccurate. The Court finds no merit in that contention.  Plaintiffs were apprised of a liability amount that included the overpayment, and they cannot now claim that the Balance Sheets were somehow incomplete because they did not expressly state that the overpayment was included.

Section 5.22 of the APA is substantially similar to Section 5.10.  It requires that all the "copies of documents delivered, provided or made available pursuant to [the APA] are complete and accurate in all material respects."  (Compl. ¶ 47.)  As stated above, Plaintiffs have not alleged that the liability amount on the Balance Sheet was incomplete or inaccurate, nor do they allege that the $5-6 million overpayment was not included in Defendants' calculations.  Section 5.22 might also be read as referring to the completeness of "copies" of documents delivered.  Even if this were the intended meaning of the provision, nothing in the Complaint suggests that any copies of Defendants' documents did not include all the pages and

13

paragraphs as they appeared in the originals.  Accordingly, the
Court concludes that Plaintiffs have not sufficiently alleged
that Defendants failed to perform their obligations under
Section 5.22 or Section 5.10.

Plaintiffs also allege a breach of Section 2.06 of the APA.
That provision requires Defendants to have cured all material
defaults or breaches under, inter alia, the C-Band Agreement.
(Compl. ¶ 56.)  Plaintiffs argue that Defendants failed to
furnish Satellite with updated lists of eligible C-Band
subscribers as required by the C-Band Agreement.

Plaintiffs' argument is infirm for two reasons.  First,
Defendants' conduct did not amount to a breach of the C-Band
Agreement.  Even if SNG did not provide Satellite with updated
lists, Satellite did not fulfill its corollary duty to notify
SNG of its belief that there was inadequate Sufficient Proof of
any customer's Eligible C-Band Subscriber status.  (See C-Band
Agreement 3.1.)  Plaintiffs allege that only Defendants could
have known whether customers were Eligible C-Band Subscribers,
but SNG's not having updated the Subscriber list for four-and-a-
half years put Satellite on notice that the Subscriber lists may
have constituted inadequate Sufficient Proof.

Second, even if such conduct did constitute a material
default in the C-Band Agreement, that Agreement was terminated

14

at the closing of the APA.  The C-Band Agreement's termination rendered immaterial any default pursuant to it.  Plaintiffs do not successfully allege Defendants' failure to perform its duties under Section 2.06 of the APA.

The dismissal of Plaintiffs' claims for breach of these other contract provisions puts Plaintiffs' claim under Section 7.10 outside of the jurisdiction of this Court.  Section 7.10 requires the parties to execute and deliver a transition services agreement.  (Compl. ¶ 59.)  The Transition Services Agreement requires Defendants to provide Plaintiffs with certain backup tapes and software, but Plaintiffs allege that Defendants did not do so.  (Compl. ¶¶ 60-62.)

Under 28 U.S.C. § 1332(a), diversity jurisdiction only applies in cases "where the matter in controversy exceeds the sum or value of $75,000."  The Complaint consistently alleges that the Overpayments totaled five to six million dollars, but what damages remain from Defendants' alleged breach of Section 7.10 - the only breach of contract claim not related to the Overpayments - is not stated.  Plaintiffs' Section 7.10 allegations do not satisfy the $75,000.01 amount in controversy requirement, and therefore shall be dismissed for lack of subject matter jurisdiction.

Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for breach of contract is hereby GRANTED.


C.   <u>Breach of Implied Duty of Good Faith and Fair Dealing</u>

Plaintiff's Complaint addresses the breach of good faith and fair dealing claim at Paragraph 65(G).  They allege: "Gemstar-TV and SNG breached the implied covenant of good faith and fair dealing by wrongfully concealing and withholding the benefits it received under the C-Band Agreement, depriving EchoStar of the right to receive the benefits represented to it in the APA, and causing EchoStar to suffer injury and incur damages." (Compl. ¶ 65(G).)

New York law implies a covenant of fair dealing and good faith in all contracts.  <u>See</u> <u>Global Intellicom, Inc. v. Thomson Kernaghan & Co.</u>, No. 99 Civ. 342, 1999 WL 544708, at *18 (S.D.N.Y. Jul. 27, 1999) (<u>citing</u> <u>Carvel Corp. v. Diversified Management Group, Inc.</u>, 930 F.2d 228, 230 (2d Cir.1991).  In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases "a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations."  <u>Chase Manhattan Bank v. Keystone Distributors, Inc.</u>, 873 F. Supp. 808, 815 (S.D.N.Y. 1994).  The

16

covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir.1989). Hence, the covenant is violated "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement." Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y.1990). "The implied covenant does not . . . operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits." Id. (citations and internal quotations omitted).

The Court agrees with Defendants that the allegations underlying this claim merely duplicate some of Plaintiffs' other breach of contract claims. (See Defs.' Mem. of Law at 20, n.9.) For example, Plaintiffs' breach of good faith and fair dealing claim is predicated on the allegations they use to support their Section 5.09 claim. Underlying both of these causes of action are allegations that Defendants deliberately withheld information about the Overpayments even though they knew Plaintiffs did not have any access to that information.

17

Moreover, Defendants' alleged violation of the covenant of good faith and fair dealing – knowingly concealing crucial information during negotiations – took place before the parties actually entered into the contract.  Parties cannot breach a contract's implied promise of good faith and fair dealing before the contract is entered into.  Claims under this theory arise when a party does something to prevent the other party from attaining an already agreed-upon benefit.  See, e.g., Black v. MTV Networks, 172 A.D.2d 8 (N.Y. 1st Dept. 1991) (where a party contracts with a principal and subsequently makes secret payments to agents of the principal, the party breached the implied covenant of good faith and fair dealing because they improperly created post-contract interests for the agents that are adverse to those of the principal); see also 22 N.Y. Jur. 2d Contracts § 230 (in claims for breach of covenant of good faith and fair dealing, "neither party [to a contract] will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").

Accordingly, Defendants' Motion to Dismiss DBS' and Acquisition's claims for breach of the covenant of good faith and fair dealing is hereby GRANTED.[4]

---

[4] Because Satellite was not a signatory to the APA, its claim for breach of the implied covenant of good faith and fair dealing, as with its claims for breaches of express contract provisions, shall be dismissed.

D.   <u>Indeminfication</u>

Defendants also seek to dismiss Plaintiffs' claim for contractual indemnification.  Because none of the other causes of action survive the motion to dismiss, Plaintiffs' indemnification claim is hereby DISMISSED as moot.

E.   <u>Unjust Enrichment</u>

Plaintiffs also include an alternative unjust enrichment claim in their Complaint.  "Generally, quasi-contractual relief, such as unjust enrichment is not permitted when an express agreement exists that governs the dispute between the parties."  <u>Bridgeway Corp. v. Citibank N.A.</u>, 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001).  Because the C-Band Agreement controls the issues Plaintiffs present in their Complaint, a claim for unjust enrichment is not proper.

Plaintiffs argue that Satellite's claim for unjust enrichment should survive because, even though the C-Band Agreement existed between the parties, it did not address how overpaid commissions were to be dealt with after the termination of the Agreement.  (Pls.' Mem. of Law at 23.)  This argument fails.  Satellite has merely re-characterized SNG's duty not to breach the C-Band Agreement's Subscriber commission provisions as

a duty to reimburse Satellite for commission overpayments after
the termination of the C-Band Agreement.  The latter, Satellite
says, was not specifically addressed in the C-Band Agreement.
However, these two duties are one and the same.  Satellite's
attempt to parse two duties from one in an effort to make hardier
its unjust enrichment claim is not proper.  The C-Band Agreement
– not the rules of equity and unjust enrichment – govern the
overpayments.

Accordingly, Defendants' Motion to Dismiss Plaintiffs'
unjust enrichment claim is hereby GRANTED.


F.   <u>Leave to Amend</u>

Even when a complaint has been dismissed, permission to
amend it "shall be freely given when justice so requires."  Fed.
R. Civ. P. 15(a).  "While it is the usual practice upon granting
a motion to dismiss to allow leave to replead," <u>Cohen v.
Citibank</u>, No. 95 Civ 4826, 1997 WL 883789, at *2 (S.D.N.Y. Feb.
28, 1997), a court may dismiss without leave to amend when
amendment would be futile.  <u>Oneida Indian Nation of New York v.
City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (citing <u>Forman
v. Davis</u>, 371 U.S. 178, 182 (1962)).

The Overpayments are a result of alleged breaches under the
C-Band Agreement, not the APA.  Granting Plaintiffs leave to

amend their Complaint so that they may allege causes of action under the APA would be futile.

### III. CONCLUSION

For the reasons contained herein, Defendants' Motion to Dismiss is GRANTED.  The Clerk of Court is directed to close the docket for this case.


SO ORDERED.

Dated:    New York, New York

*February 8, 2007*


Deborah A. Batts
United States District Judge

21